1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEAN M. BELMONT, | )   1:08cv0181 DLB |
| | ) |
| | ) |
| | )   ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | )   SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Jean M. Belmont ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff applied for DIB and SSI on November 1, 2004, alleging disability since March 29, 2003, due to hepatitis C, rheumatoid arthritis and fibromyalgia.  AR 67, 87, 93.  After being

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On July 21, 2008, the action was reassigned to the Honorable Dennis L. Beck for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative

2   Law Judge ("ALJ").  AR 62, 67, 72, 73-77, 79-83.  On April 4, 2007, ALJ David E. Flierl held a

3   hearing.  AR 42-61.  ALJ Flierl denied benefits on July 23, 2007.  AR 14-25.  On December 3,

4   2007, the Appeals Council denied review.  AR 5-8.

5       Hearing Testimony

6       _____ALJ Fleirl held a hearing on April 4, 2007, in Fresno, California.  AR 17, 42.  Plaintiff

7   appeared with her non-attorney representative, Richard Handel.  AR 26, 44.  Dr. Thomas

8   Dachelet, vocational expert ("VE"), also appeared and testified.  AR 44, 48.

9       Plaintiff was born in 1955.  AR 45.  She is 5'7" and weighs 180.  AR 45.  She is right-

10  handed.  AR 45.  She has a California driver's license.  AR 45.  She graduated from high school.

11  AR 46.  She also completed an adult school secretarial course and two years at a city college, but

12  did not receive a degree.  AR 46.  She now has problems reading, writing and seeing clearly.  AR

13  46.

14      Plaintiff testified that her main occupation for the last 15 years was sales.  AR 46.

15  Basically, she contacted people to get them to either purchase a service or a product.  AR 47.

16  She sat most of the day and lifted 10 pounds or less.  AR 47-48.  The VE classified Plaintiff's

17  telemarketing work as sedentary SVP per the DOT at semiskilled.  AR 48.  While in phone sales,

18  Plaintiff tried to work around her illness and cut back hours.  AR 48-49.  She asked for a leave of

19  absence to get treated.  AR 49.  Her fibromyalgia and depression interfered with her job.  AR 49.

20      Plaintiff testified that she suffers from chronic pain and overwhelming fatigue from her

21  fibromyalgia.  AR 49.  She will get disoriented and cannot remember anything.  AR 49.  She was

22  diagnosed with fibromyalgia about three years before the hearing.  AR 49.  The pain management

23  specialist, Dr. Kalamkarian, diagnosed her.  AR 49-50.  Without medication, her pain is 8 or 9

24  out of 10.  AR 50.  With medication, the pain can go up to a 7 or 8.  AR 50.  She tries to keep the

25  pain at 4 or 5, where it is "bearable."  AR 50.  She takes 80 milligrams of Oxycodone three times

26  a day.  AR 50.  In between, she takes another kind of Oxycodone if the pain returns.  AR 50.

27      Plaintiff testified that she is always fatigued.  AR 51.  She rarely sleeps through the night.

28  AR 51.  She is generally in bed by 8:00 and wakes up at 8:00 in the morning.  AR 51.  In those

1   12 hours, she probably gets two to three straight hours of sleep.  AR 51.  She wakes up and then

2   goes back to sleep for another two to three hours.  AR 51-52.  During the day, she is fatigued all

3   the time.  AR 52.  Sometimes she cannot drive.  AR 52.  She cannot function and can only lie

4   down.  AR 52.  At least 3 to 4 days a week, she lies down all day.  AR 52.

5          Plaintiff testified that the pain due to fibromyalgia is like a "really, really bad abscess

6   tooth."  AR 52.  She gets spots on her head that she cannot touch softly or spots in her legs.  AR

7   52.  It is "like ... something hot is being shoved down from [her] butt into [her] legs."  AR 52.  It

8   will go into her feet.  AR 52.  Her fatigue and pain affect her ability to concentrate.  AR 53.  She

9   can read a newspaper and understand what it says.  AR 53.  She tries to read every week.  AR 53.

10  When she reads, she gets tired.  AR 53.  If she is really fatigued, she cannot tell what she read.

11  AR 53.  Her fibromyalgia might be aggravated because she has rheumatoid arthritis.  AR 53.  She

12  also has Hepatitis C, which probably contributes to her fatigue.  AR 53.  She takes Remeron for

13  depression.  AR 53.

14         Plaintiff lives with her husband and son.  AR 54.  Her daughters come over and help with

15  housework.  AR 54.  She can stand for 10 or 15 minutes.  AR 54.  She can walk about 15 or 20

16  minutes.  AR 55.  She can sit for 20 to 25 minutes.  AR 55.  She has to constantly shift.  AR 55.

17  When it gets uncomfortable, she lies down.  AR 55.

18         Plaintiff also testified that she has degenerative disc disease of her lumbar spine.  AR 55.

19  She thinks that it might cause both shooting pains and her arm and hands to fall asleep.  AR 55.

20  An "orthopedic person" prescribed a neck brace and a wrist brace.  AR 56.  She has degenerative

21  changes in her cervical spine and in her lower back.  AR 56.  She has pain in her lower back to

22  her hips, shooting down in to her legs.  AR 56.  She did not want to risk paralysis by having

23  surgery.  AR 56.  She tries to control it with pain medication.  AR 56.  Since her last job, her

24  condition "seems to have gotten worse."  AR 57.

25         Plaintiff testified that she smokes about a pack a day.  AR 57.  She used to drink warm

26  brandy to relieve the pain.  AR 58.  She was having stomach problems from over-the-counter

27  medication.  AR 58.  Since they found out she needed to be on a medicine that helped the

28  problem, she has not had a drop of alcohol.  AR 58.

1    Plaintiff testified that she worked in a bar for six months.  AR 58-59.  She worked six or

2    seven hours.  AR 59.  They changed owners and let everybody go.  AR 59.

3    Plaintiff also testified that she sleeps with 7 to 10 pillows because she can lie only on her

4    back.  AR 60.  If she lies on her side, it causes her hips and her arms to be aggravated.  AR 60.

5    She has to prop her knees and arms up at a certain level or they go numb.  AR 60.  She will get a

6    deep ache and take hot baths for momentary relief.  AR 60.

7    Medical Record

8    In June 14, 1996, Plaintiff was assessed with depression/anxiety, headache and insomnia.

9    AR 255.

10    On September 27, 1996, Plaintiff complained of severe indigestion.  AR 241.  The

11    provider assessed her with a possible hiatal hernia with esophagitis, chronic, with exacerbation

12    under stress.  AR 241.  She was prescribed Levsin, Prevacid, Xylocaine and Vicodin.  AR 241.

13    The provider noted "stay alert for drug seeking behavior."  AR 241.  Plaintiff reportedly called

14    back 30 minutes later indicating that the Xylocaine did not help.  AR 241.  She requested a pain

15    shot, but was told to give it more time and try Vicodin.  AR 241.  The provider noted "(suspect?

16    drug seeking)."  AR 241.

17    On October 3, 1996, Paul L. Hanchett, M.D., of the G.I. Medical Group of Fresno, Inc.,

18    conducted a gastroenterology consultation.  AR 239-40.  Plaintiff reported worsening intermittent

19    epigastric pain.  AR 239.  She also reported frequent lower abdominal pain and rectal pain, with

20    occasional vomiting, lots of bloating and gas, along with longstanding indigestion and heartburn.

21    AR 239.  Dr. Hanchett determined that Plaintiff had probable biliary colic, gastroesophageal

22    reflux disease, and probable superimposed irritable bowel.  AR 239.  A subsequent ultrasound

23    was negative for stones or thickened gallbladder.  AR 238.  Dr. Hanchett opined that Plaintiff's

24    symptoms were probably irritable bowel and gastroesophageal reflux disease.  AR 238.  She was

25    to continue Zantac and Bentyl.  AR 238.

26    On November 11, 1996, Adriana Padilla, M.D., of Valley Prime Care, prepared a letter on

27    behalf of Plaintiff.  AR 234.  Dr. Padilla indicated that Plaintiff suffered from irritable bowel,

28    urinary stress incontinence, biliary colic and anxiety with depressive episodes.  AR 234.  Dr.

4

Padilla reported that Plaintiff needed "to serve community service time with the courts as payback for fraud case she herself reported." AR 234.  Dr. Padilla opined that Plaintiff medically required some restrictions in the format of her sentence, with frequent breaks and bathroom access because of her irritable bowel and urinary stress incontinence. AR 234.  Dr. Padilla further indicated that Plaintiff "verbalized...that she is incapable of performing work that requires prolonged standing or lifting greater than 10 pounds for 8 hours a day for six month continuously." AR 234.  Dr. Padilla believed that Plaintiff's stamina was short and she was barely able to hold a part-time job because of stress and anxiety. AR 234.  Plaintiff was taking an antidepressant and would be starting therapy. AR 234.  Dr. Padilla also believed that Plaintiff could "handle a light duty sentence (no prolonged standing and no heavy lifting greater than 10 pounds)" and hoped that Plaintiff's sentence would be reconsidered to accommodate her medical need. AR 234.  A separate letter signed by Dr. Padilla, also dated November 11, 1996, indicated that Plaintiff was willing "to extend the months of hard labor if she [could] cut the hours to 4 hours per day." AR 235.  Dr. Padilla believed that Plaintiff could handle this amount of time. AR 235.

On May 15, 1997, Plaintiff reported taking phen-phen for her diet. AR 230.  She was assessed with chronic headaches of a vascular type. AR 230.  Plaintiff felt she was experiencing an allergic reaction to Vicodin and was given a trial of Darvocet. AR 230.  The provider noted that her anxiety and depression were stable. AR 230.

In June 1997, Plaintiff complained of pain on the top of her head down to her jaw for three days, along with photophobia, unilateral throbbing and tender spots on her scalp. AR 231.  She was diagnosed with a headache. AR 231.  No codeine was given due to a suspected rebound headache. AR 231.

On February 12, 1998, Plaintiff was diagnosed with chronic migraine, GERD and depression. AR 221A.  In May 1998, Plaintiff requested something to calm her down. AR 222.  She was prescribed Ativan, but it made her feel drowsy and agitated. AR 222.  She later was prescribed a trial of Xanax. AR 222.  In June 1998, Plaintiff complained of a bad headache and difficulty sleeping. AR 222.  She had a court case the following day and indicated she was out of

1    Vicodin ES.  AR 22.  She was given an "early fill" of Vicodin.  AR 222.  In August 1998, she

2    had a migraine headache and was prescribed Demerol.  AR 355.

3        On April 10, 1999, Plaintiff was assessed with chronic pain.  AR 250.

4        On May 20, 1999, Plaintiff underwent a nerve conduction study, which revealed bilateral

5    C5, C6, C8 and T1 root lesion and bilateral brachial plexopathy.  AR 2-6-07.

6        On June 7, 1999, Plaintiff sought emergency room treatment at Saint Agnes Medical

7    Center for complaints of numbness in her extremities and dizziness.  AR 204.  She also reported

8    weakness and fatigue.  AR 204.  She was diagnosed with neurological symptoms and prescribed

9    Phenergan with codeine.  AR 204-05.

10       On July 23, 1999, Sadda V. Reddy, M.D., of Neurosurgical Associates Medical Group,

11   Inc., completed a neurological consultation of Plaintiff.  AR 197.  On physical examination,

12   Plaintiff was 5'7" and weighed 280 pounds.  AR 199.  Her strength was normal in all muscle

13   groups in both upper and lower extremities.  AR 200.  A sensory exam revealed a patchy

14   decrease in sensation in the outer aspect of the left forearm and in the outer aspect of both legs

15   below the knees, but did not follow a typical dermatomal pattern.  AR 200.  Her cervical spine

16   movements were normal, but somewhat uncomfortable.  AR 200.  She had some tenderness in

17   the interscapular region bilaterally.  AR 200.  Dr. Reddy assessed Plaintiff with probable cervical

18   radiculopathy, rule out herniated disc, and probable fibromyalgia.  AR 201.  Dr. Reddy indicated

19   that the generalized aches and pains that Plaintiff had been having could not be explained on the

20   basis of cervical radiculopathy.  AR 201.  Dr. Reddy wanted an MRI and x-ray of the cervical

21   spine because of complaints of occipital headaches, neck pain and pain radiating along both

22   upper extremities in a C6 dermatomal pattern.  AR 201.

23       Cervical spine x-rays taken on August 5, 1999, revealed mild degenerative changes at C5-

24   6.  AR 194-95.  An MRI of the cervical spine showed mild broad based posterior osteophyte/hard

25   disc formation at C5-6, without evidence of focal posterior disc protrusion or cord compression.

26   AR 196.  There also appeared to be mild asymmetric narrowing of the left C5-6 neural foramen.

27   AR 196.

28

On August 26, 1999, Dr. Reddy reported that Plaintiff's sedimentation rate was normal, her rheumatoid factor was negative, and her anti-nuclear antibody was negative, but cytoplasmic fluorescence was present, which was generally associated with mononucleosis, chronic active hepatitis and liver disease.  AR 191.  Dr. Reddy recommended referral to a rheumatologist.  AR 191.  An MRI scan of the cervical spine showed degenerated disc at the C5-6 level, consistent with clinical left C6 radiculopathy.  AR 191.  Dr. Reddy recommended a course of physical therapy and cervical traction.  AR 192.

On September 1, 1999, H. John Kim, M.D., completed a comprehensive rheumatic evaluation of Plaintiff.  AR 188-190.  Dr. Kim noted that Plaintiff had chronic pain, tingling and numbness in her hands and arms since March 1999.  AR 188.  She also had chronic fatigue, migraines and total body pain for 10 years.  AR 188.  On physical examination, Plaintiff had no proximal muscle weakness or tenderness.  AR 189.  A peripheral joint examination revealed mild osteoarthritis and tenderness of right finger DIP joint.  AR 189.  Her hands, wrists, elbows, shoulders, hips, knees, ankles and feet were negative without localized tenderness, active synovitis, effusion or limitation of range of motion.  AR 189.  Her spine revealed mild bilateral SI joint tenderness.  AR 189.  Her cervical, dorsal and lumbar spine were negative.  AR 189.

Dr. Kim assessed Plaintiff with chronic atypical fibromyalgia syndrome, chronic headache and chronic emotional disorder.  AR 190.  She also had chronic bilateral carpal and tarsal tunnel syndrome, a history of gastritis from nonsteroidal anti-inflammatory drugs, and multiple nail pittings without psoriasis or psoriatic arthritis.  AR 190.  Dr. Kim recommended weight reduction, soft neck collar and bilateral wrist braces at night, salsalate and Elavil.  AR 190.  Dr. Kim also indicated that Plaintiff needed comprehensive counseling and emotional support.  AR 190.

On May 15, 2000, Plaintiff sought treatment from Dr. Padilla for skin tag removal.  AR 187.  She also was diagnosed with chronic upper back pain and insomnia.  AR 187.

On March 2, 2001, Plaintiff was evaluated by Berj T. Kalamkarian, M.D., at the San Joaquin Center for Pain Management Consultation.  AR 171-72.  Plaintiff reported that her activities gradually were diminished and limited with increased fatigue and pain.  AR 171.  She

described her pain as "aching, burning, cramping, stinging, stabbing, shooting, sharp, heavy, intense, constant, severe, unbearable and excruciating at times." AR 171. The pain was aggravated by "physical activity, movement, pressure, weather changes, sexual intercourse, sitting, standing, tension, bright lights, loud noises, fatigue, sneezing and coughing." AR 171. It was "relieved by liquor." AR 171. Plaintiff also reported smoking approximately five packs a day for more than 25 years and giving up drinking completely. AR 171. She indicated that she was a salesperson, but not able to work. AR 171.

On physical examination, Plaintiff was healthy-looking, in no acute distress, but in significant discomfort on examination. AR 171. She weighed 200 pounds. AR 171. Inspection of her neck, head and spine was unremarkable. AR 171. Her neck range of motion "was preserved to all directions with increased pain in the neck and shoulder area." AR 171-72. Range of motion in her lumbar spine was limited with pain due to muscle pulling sensation. AR 172. Palpation of the musculature and the classical fibromyalgia pain points in the neck, shoulder, intraclavicular area, in the lower back, elbows and knees were positive in 12-14 points. AR 172. She was neurologically intact. AR 172. Dr. Kalamkarian diagnosed Plaintiff with fibromyalgia, chronic total body ache and depression/anxiety. AR 172. He gave her samples of Remeron and Zanaflex. AR 172. He also prescribed 20mg of OxyContin to be taken every 12 hours. AR 172.

On March 15, 2001, Plaintiff reported to Dr. Kalamkarian that she was "feeling so much improved." AR 170. She was "delighted" and wanted to continue with her current medication of OxyContin twice a day, Remeron and Zanaflex. AR 170.

In April 2001, Plaintiff reported responding "very favorably to the treatment." AR 169. She started working part time, but noted significant breakthrough pain eight hours after taking her medication. AR 169. She wanted to take the medication every eight hours. AR 169. Dr. Kalamkarian prescribed OxyContin 40mg to be taken every eight hours. AR 169.

On June 14, 2001, Plaintiff reported taking more medication without authorization from Dr. Kalamkarian's office. AR 168. She wanted to start working and began taking two OxyContin in the morning with one every eight hours afterward. AR 168. Plaintiff indicated

that her pain was still persisting but the OxyContin was helping her.  AR 168.  Dr. Kalamkarian issued a new prescription allowing Plaintiff to take two OxyContin in the morning and then one every eight hours.  AR 168.

On June 22, 2001, Plaintiff and Dr. Padilla discussed a drug holiday.  AR 184.

In August 2001, Plaintiff saw Dr. Kalamkarian.  AR 167.  She reported that she had started working in a bar and her OxyContin at 40mg five times a day was not adequate for the significant physical activity.  AR 167.  She wanted more OxyContin because taking Oxy IR for breakthrough pain gave her significant weakness and sleepiness.  AR 167.  She was given a prescription for two OxyContin 40mg to be taken every eight hours.  AR 167.  Dr. Kalamkarian informed Plaintiff of the potential hazards of using opioid analgesics.  AR 167.  He also told her that there would be no raise in dosage for at least one year.  AR 167.

In October 2001, Plaintiff was diagnosed with depression and referred to a therapist.  AR 186.

In November 2001, Plaintiff reported to Dr. Kalamkarian that recent weather changes had increased her pain and the OxyContin and the Oxy IR at the scheduled rate were not sufficient.  AR 166.  Dr. Kalamkarian discussed the habituation, tolerance and dependency that could develop with opioid analgesics.  AR 166.  He recommended a drug holiday of 10-15 days and then restarting at a lower dosage.  AR 166.  Plaintiff indicated her willingness, but claimed the medications were giving her the ability to work and to have a "productive life."  AR 166.  Her medications were refilled.  AR 166.

In December 2001, Plaintiff again reported to Dr. Kalamkarian that weather changes had increased her pain significantly.  AR 165.  As to the possibility of the narcotic holiday, Plaintiff reported conducting her own research and finding that she should not stop the medications abruptly for fear of withdrawal.  AR 165.  Plaintiff felt that she was functioning adequately with the current medications, including Zanaflex, Remeron, OxyContin and Oxy IR.  AR 165.

In February 2002, Plaintiff sought treatment from Dr. Kalamkarian for complaints of total body ache.  AR 164.  On physical examination, palpation of the back was tender with trigger pressure points of the trapezius, levator scapula and supraspinatus as well as rhomboid muscles.

1   AR 164.  Lower back palpation was diffusely painful due to tense paravertebral muscles.  AR

2   164.  Plaintiff was neurologically intact.  AR 164.  Dr.  Kalamkarian assessed her with

3   fibromyalgia, chronic total body ache and depression/anxiety.  AR 164.  He lowered her

4   Remeron dosage and advised her to take Zanaflex.  AR 164.

5        Plaintiff next saw Dr. Kalamkarian for a follow-up visit in April 2002.  AR 163.  She

6   missed her last appointment and also missed two previous appointments.  AR 163.  Plaintiff

7   requested that her pain medication be increased due to decreasing effectiveness.  AR 163.  Dr.

8   Kalamkarian advised against the practice, suggesting she deal with her pain with the current

9   medications.  AR 163.  Dr. Kalamkarian also told her not to expect that the pain medications

10  would take care of all her problems and it would require "some effort from her side to contain

11  her pain."  AR 163.  On physical examination, palpation of the back and the midscapular area

12  was tender to pressure with fibromyalgia pain points.  AR 163.

13       On June 11, 2002, Plaintiff complained to Dr. Kalamkarian of increased pain.  AR 162.

14  She also reported losing her job because the pain caused her to miss work.  AR 162.  She asked

15  for more medications, stating her OxyContin was not helping her.  AR 162.  Dr. Kalamkarian

16  informed Plaintiff that increasing the medication was not a choice and, in the absence of any

17  trauma, illness or accident, needing to increase the medication was probably habituation.  AR

18  162.  He also told her that she "should not be blaming her pain for not going to work or being

19  fired from work."  AR 162.  Dr. Kalamkarian suggested that Plaintiff change her medication to

20  Durogesic patches.  AR 162.

21       On June 27, 2002, Plaintiff saw Dr. Kalamkarian and complained of total body ache.  AR

22  161.  She reported that Durogesic was not satisfactory and that she wanted to go back on

23  OxyContin.  AR 161.  Plaintiff also complained of personal and family problems, a decreased

24  work pattern, financial problems and depression.  AR 161.  Dr. Kalamkarian issued a new

25  prescription for OxyContin and Oxy IR.  AR 161.

26       On September 24, 2002, Plaintiff saw Dr. Kalamkarian, who noted that Plaintiff always

27  expressed the desire to get off opioid analgesics and other medications and treat her problems

28  with more natural resources, but she remained "dependent on the OxyContin and Oxy IR."  AR

159.  Plaintiff requested an increase in her OxyContin dosage "with no apparent reason or any incident of aggravation of her pain."  AR 159.  Plaintiff planned to discontinue the medication in two years, but it was not clear how she came to the deadline.  AR 159.  Dr. Kalamkarian reminded her that she was requesting more medication "instead of working towards decreasing the amount of medication."  AR 159.  Plaintiff was resistant to using antidepressants, including SSRI inhibitors that are an adjuvant treatment for fibromyalgia patients.  AR 159.  Plaintiff argued that she was not depressed and did not need the antidepressants.  AR 159.  Dr. Kalamkarian informed Plaintiff that he did not see any reason to increase her pain medications. AR 159.

On November 21, 2002, Plaintiff received follow-up treatment from Dr. Kalamkarian for a medication refill.  AR 158.  Plaintiff stated that she was doing quite well.  AR 158.  There were no significant changes in her overall condition and her prescriptions were renewed.  AR 158.

On January 9, 2003, Plaintiff reported prescription refill problems to Dr. Kalamkarian. AR 157.  She previously asked the office to renew her medication prior to her refill date because she was short on OxyContin.  AR 157.  She reportedly had significant discomfort/pain and suffered through the lack of medication "although she was not completely out."  AR 157.  Dr. Kalamkarian noted that he gave Plaintiff a refill two days earlier than the usual date.  AR 157.  It was uncertain whether the pharmacy provided a low number of medications.  AR 157.

On February 4, 2003, Plaintiff and her husband saw Dr. Kalamkarian.  AR 156.  Plaintiff reported that her medication was not helping and she occasionally took an additional OxyContin. AR 156.  She claimed that she was back at work, but missing days.  AR 156.  Plaintiff's husband requested "an explanation for her sufferings and pain as if this...just started."  AR 156.  He also complained of increased stress and suffering due to his wife's pain.  AR 156.  Dr. Kalamkarian prescribed 100mg OxyContin three times a day, increasing to four with severe pain.  AR 156.

On March 4, 2003, Dr. Kalamkarian noted that Plaintiff had several requests on several occasions for medication changes and increased usage.  AR 15.  Plaintiff had been using an extra OxyContin and the medication did not last.  AR 155.  Dr. Kalamkarian indicated that Plaintiff was "quite selective in her requests for the control of her pain."  AR 155.  She reportedly felt

very comfortable, with a pain rating of 2/10.  AR 155.  She was given a new prescription and allowed to take one extra OxyContin once or twice a week for the control of severe pain.  AR 155.

On May 6, 2003, Plaintiff saw Dr. Kalamkarian and reported "doing quite stable under OxyContin and Oxy IR."  AR 154.  She was working.  AR 154.  Dr. Kalamkarian allowed her to pick up her prescription earlier to save her an extra visit to the office.  AR 154.

In July 2003, Plaintiff saw Dr. Kalamkarian and reported feeling quite stable.  AR 153.  She indicated that her work demanded that she move around a lot and travel.  AR 153.

On September 23, 2003, Plaintiff again saw Dr. Kalamkarian.  AR 152.  She was depressed due to difficulties with her father, but continued to work despite her pain.  AR 152.  Her prescriptions were renewed.  AR 152.

On December 18, 2003, Plaintiff saw Dr. Kalamkarian, who indicated that Plaintiff took OxyContin three times a day totaling 90 per month, but due to occasional flare ups needed one more.  AR 151.  Dr. Kalamkarian reported giving Plaintiff an extra 10 OxyContin.  AR 151.  He indicated that the insurance company had not allowed 100 pills because the prescription dictated one every 6-8 hours, which was not indicated because the medication should last at least 8-12 hours.  AR 151.  Plaintiff requested the 100 OxyContin, but was informed that it would not serve the purpose and would not be an honest prescription.  AR 151.  Dr. Kalamkarian suggested substituting Roxicodone every 4-6 hours for breakthrough pain.  AR 151.  Plaintiff was "not very satisfied," but agreed.  AR 151.  She argued that due to the death of her father she has to travel frequently to Oregon and back, which would cause flare-ups.  AR 151.

On February 24, 2004, Plaintiff saw Dr. Kalamkarian and reported she was very stable that day, with pain at a 1 on a scale of 10.  AR 150.  Her medications were renewed.  AR 150.

On May 17, 2004, Plaintiff saw Dr. Padilla and wanted short-term disability.  AR 182.  Dr. Padilla diagnosed chronic pain syndrome with fibromyalgia.  AR 182.  Plaintiff did not have a positive diagnosis of rheumatoid arthritis.  AR 182.

On June 8, 2004, Plaintiff saw Dr. Kalamkarian, who noted that Plaintiff's chronic generalized pain was controlled with Zanaflex, Remeron and Roxicodone  AR 148.  Plaintiff reported "doing quite stable on the regimen" and her medications were renewed.  AR 148.

On September 2, 2004, Plaintiff sought treatment from Dr. Kalamkarian.  AR 147.  She reported doing quite well, but had discovered from Dr. Kammen that she had rheumatoid arthritis, which was contributing to her pain.  AR 147.  Dr. Kalamkarian indicated that he had no reports or lab results indicating such a disease, but was not disputing it.  AR 147.  Plaintiff said that she was going out of town over the holidays and requested her medication at an earlier date.  AR 147.  Dr. Kalamkarian indicated that this happened frequently and "due to the stress or discomfort of driving two hours from Bass Lake," he agreed to refill her medication.  AR 147.

Plaintiff saw Dr. Kalamkarian on November 24, 2004.  AR 146.  She complained of migraine headaches and stress.  She also requested her medications at an earlier date.  AR 146.  Dr. Kalamkarian noted that "usually she argues that this is the Holidays and she may run out of the medication over the Holiday time."  AR 146.  Her medications were renewed.  AR 146.

Plaintiff again saw Dr. Kalamkarian on January 9, 2005.  AR 335.  She reported taking two OxyContin every 12 hours instead of one every six hours.  AR 335.  She also had used more of the Oxy IR due to severe pain.  AR 335.  Plaintiff rated her pain at 7 out of 10.  AR 335.  Her medication was renewed.  AR 335.

 On January 24, 2005, Plaintiff saw Dr. Kalamkarian for pain and medication refills.  AR 145.  Plaintiff rated her pain at 3 out of 10.  AR 145.  Physical examination did not reveal any new findings and her medications were renewed.  AR 145.

On March 17, 2005, Plaintiff saw Dr. Kalamkarian and reported that her breakthrough pain medication, Roxicodone, was not helping her six hours and she wanted an increase in her dosage.  AR 272.  Dr. Kalamkarian indicated that she "also came up with another request of getting [an] earlier prescription because she [was] going to leave town."  AR 272.  On physical examination, there were no major changes.  AR 272.  She rated her pain at 7 out of 10.  AR 272.  Dr. Kalamkarian discussed medication habituation and tolerance formation with Plaintiff.  AR

1  272.  Her medications were renewed, including Roxicodone every four hours instead of six.  AR

2  272.

3      On March 18, 2005, Plaintiff reported swollen, painful joints and trigger points.  AR 271.

4  She was diagnosed with possible rheumatoid arthritis, Hepatitis C and depression.  AR 271.

5      On April 14, 2005, Plaintiff underwent an examination by Pamela Kammen, M.D., a

6  rheumatologist.  AR 268-270.  On physical examination, Plaintiff's skin, HEENT, chest,

7  cardiovascular and abdominal exams were within normal limits.  AR 269.  The musculoskeletal

8  exam failed to reveal any actively inflamed, swollen or warm joints.  AR 269.  There were

9  multiple scattered trigger points.  AR 269.  All joints had full range of motion.  AR 269.  Dr.

10  Kammen opined that Plaintiff had a history of diffuse chronic pain syndrome affecting both

11  muscle and joint and associated with multiple trigger points on physical exam.  AR 269.  Using

12  the criteria for fibromyalgia as defined by the American College of Hematology, Plaintiff

13  fulfilled the diagnosis for fibromyalgia.  AR 269.  She did not have any inflammatory disease,

14  such as rheumatoid arthritis.  AR 269.  Dr. Kammen noted that, as in the case of many

15  fibromyalgias, Plaintiff had associated conditions such as migraine headaches, depression,

16  memory loss, sleep disruption and fatigue.  AR 269.  Dr. Kammen recommended Cymbalta, a

17  trial of Baclofen to control some symptoms, and focusing on Plaintiff's sleep patterns.  AR 270.

18  She suggested pursuing the possibility of sleep apnea or otherwise treating Plaintiff's sleep

19  disruption with hypnotics or other antidepressants.  AR 270.

20      On May 16, 2005, Plaintiff saw Dr. Kalamkarian and complained of overall pain.  AR

21  289.  She rated her pain an 8 out of 10, with most of her pain in the right wrist radiating to the

22  lower third of the right forearm.  AR 289.  Examination revealed no new findings.  AR 289.

23      On May 22, 2005, Steven Stoltz, M.D., conducted a consultative internal medicine

24  evaluation.  AR 273-78.  Plaintiff complained of a history of fibromyalgia and hepatitis C.  AR

25  273.  She reported smoking 15-20 cigarettes a day, but denied alcohol use.  AR 274.  On physical

26  examination, Plaintiff was alert, cooperative, and well-oriented in all spheres.  AR 275.  Her back

27  had multiple tender points mainly in the mid-scapular region and somewhat in the lower

28  paraspinal area.  AR 276.  She had good range of motion with negative straight leg raising signs.

14

AR 276.  She had multiple tender points in the lower distal legs and somewhat in the lateral thigh area.  AR 276.  Dr. Stoltz diagnosed Plaintiff with Hepatitis C and Fibromyalgia.  AR 277.  He opined that Plaintiff's standing and walking should be tolerable for a total of four hours in an eight-hour work day.  AR 278.  She could sit, lift and carry without restriction.  AR 278.

On June 13, 2005, Patrick D. Ginn, M.D., Pharm.D., of Digestive Disease Consultants, completed a gastroenterology consultation.  AR 281.  Dr. Ginn diagnosed Plaintiff with a history of abnormal liver enzymes and a hepatitis C antibody positive test in a patient with chronic fatigue and pain syndrome.  AR 282.  He planned to conduct more tests.  AR 282.  A notation in the record dated February 3, 2006, indicated that Plaintiff did not do any recommended tests or contact Dr. Ginn for further care after the initial visit.  AR 324.

On July 11, 2005, Plaintiff saw Dr. Kalamkarian and requested that he fill out a work capacity questionnaire.  Dr. Kalamkarian indicated it was beyond his expertise and requested referral to a work capacity evaluator.  AR 288.

In July 2005, Carmen E. Lopez, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment form.  AR 305-312.  Dr. Lopez opined that Plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently, could stand and/or walk at least 2 hours in an 8-hour workday, could sit about 6 hours in an 8-hour workday, and could push and/or pull without limitation.  AR 306.  She had no postural, manipulative, visual, communicative or environmental limitations.  AR 307-09.

On August 1, 2005, Archimedes Garcia, M.D., a state agency psychiatrist, completed a Psychiatric Review Technique form.  AR 291.  Dr. Garcia opined that Plaintiff's affective disorders were not severe impairments.  AR 291.

On August 22, 2005, Plaintiff saw Dr. Kalamkarian for a medication refill.  AR 287.  Plaintiff was stable with continuous pain.  AR 287.  She rated her pain at 3 out of 10.  AR 287.

On October 6, 2005, Plaintiff presented chronic complaints to Dr. Kalamkarian and rated her pain as 10 out of 10.  AR 330.  On physical examination, her gait was normal, but she had limited range of motion in her back.  AR 330.  Palpation of her neck, shoulders, lower back and infraclavicular points were positive 12 out of 18.  AR 330.

1    On December 7, 2005, Dr. Padilla completed a Medical Source Statement - Physical

2 form.  AR 393-94.  Dr. Padilla opined that Plaintiff's lifting/carrying was affected by her

3 impairments.  AR 393.  Based on Dr. Padilla's "subjective opinion," Plaintiff could carry 10

4 pounds occasionally, less than 10 pounds frequently, could stand/walk at least 2 hours in an 8-

5 hour workday and could sit less than 6 hours out of an 8-hour workday.  AR 393.  Dr. Padilla

6 indicated that Plaintiff could sit for 3 hours and needed to alternate standing and sitting.  AR 393-

7 94.  Plaintiff required a change in position every 2-3 hours.  AR 394.  She could never climb,

8 balance, stoop, kneel, crouch, or crawl.  AR 394.  Dr. Padilla indicated that she had no means to

9 answer whether Plaintiff had environmental restrictions, such as heights, moving machinery, or

10 dust, without asking Plaintiff.  AR 394.  Dr. Padilla opined that Plaintiff's prognosis was

11 "progressive."  AR 394.

12    In a medical record from Dr. Kalamkarian dated February 13, 2006, Plaintiff rated her

13 pain a 3 out of 10.[3]  AR 328, 425.

14    On April 14, 2006, Dr. Padilla opined that she did not feel Plaintiff could work full time

15 and she was doubtful Plaintiff could work part time.  AR 323.  Dr. Padilla indicated that she

16 would support Plaintiff's disability status due to, among other things, fatigue, fibromyalgia and

17 depressed mood.  AR 323.

18    On April 17, 2006, Plaintiff saw Dr. Kalamkarian, who noted that Plaintiff seemed to be

19 "quite distressed...for no apparent reason or aggravation of her pain."  AR 237.  Plaintiff rated

20 her pain a 2 out of 10.  AR 327.  She was given samples of Lyrica, because Neurontin reportedly

21 made her sick.  AR 327.

22    On May 18, 2006, Plaintiff again saw Dr. Kalamkarian for a routine follow-up

23 appointment.  AR 374.  Plaintiff stated that she continued to have pain, rated 4-5 on a scale of 10.

24 AR 374.  Her overall condition had not changed.  AR 374.

25    On July 11, 2006, Plaintiff received treatment from Gregory Bijak, M.D., at San Joaquin

26 Center for Pain Management, complaining of right instep foot pain.  AR 368.  On physical

27

28    [3]The record contains a handwritten notation purportedly questioning the 02/13/09 date, i.e. "? 6."  AR 328.

examination, her back revealed mild diffuse tenderness throughout, her right ankle had grossly reduced range of motion and she had a 2cm nodule on her instep.  AR 368.  Dr. Bijak assessed fibromyalgia, chronic fatigue syndrome and generalized body pain.  AR 368.

Plaintiff again visited Dr. Kalamkarian on August 21, 2006, and reported she was quite stable, with a "significant amount of activity" and pain at 4 out of 10.  AR 367.  There were no new findings on physical examination and her medications were renewed.  AR 367.

On September 13, 2006, Plaintiff's representative, Charles Binder of Binder & Binder, requested that Plaintiff see an independent medical doctor.  AR 326.  Mr. Binder indicated that he was "not convinced that the Administrative Law Judge will issue a favorable decision on the basis of the medical record as its [sic] stands."  AR 326.  Mr. Binder selected Bruce Thompson, M.D., to conduct an independent examination for a fee of $375.00, payable by Plaintiff to the doctor prior to the appointment.  AR 326.

On November 27, 2006, Plaintiff was diagnosed with poor energy, stable depression and Hep C contributing to fatigue.  AR 372.

On October 2, 2006, Plaintiff saw Dr. Kalamkarian and stated that she was "doing quite stable."  AR 366.  She reported left shoulder pain and rated her pain 6-7 on a scale of 10.  AR 366.  Range of motion in her left shoulder was limited due to increased pain and palpation was tender in the acromioclavicular joint region.  AR 366.  Dr. Kalamkarian assessed Plaintiff with fibromyalgia, chronic pain syndrome and recently developed left shoulder pain.  AR 366.

Plaintiff saw William Johncox, PA-C, at San Joaquin Center for Pain Management, for follow-up evaluation on November 13, 2006.  AR 365.  She rated her pain at 3 on a 1-10 scale and stated it was well controlled with medications.  AR 365.  Plaintiff reported developing "pressure points" on her body and head.  AR 365.  On physical examination, Plaintiff was tender in the anterior left deltoid and in the cervical spine paravertebral muscles down to S1 and the rhomboids bilaterally.  AR 365.  PA-C Johncox assessed Plaintiff with fibromyalgia and shoulder pain.  AR 365.  Her treatment plan was to continue current medical regimen as it seemed to be "controlling her symptoms."  AR 365.  Plaintiff returned on December 26, 2006, for follow-up evaluation.  AR 415.  She rated her pain at 4-5 out of 10.  AR 415.  On

1   examination, Plaintiff's cervical spine range of motion was diminished by 75 percent of normal

2   with pain.  AR 415.  She was to continue her current medical regimen.  AR 415.

3       In January 2007, Plaintiff saw Dr. Kalamkarian and reported that she was "doing quite

4   well."  AR 414.  Physical examination revealed no new findings and her medications were

5   renewed.  AR 414.

6       In February 2007, Plaintiff saw PA Johncox for pain management re-evaluation.  AR 412.

7   She rated her pain at 5 out of 10 and complained of being sore from the rain.  AR 412.  On

8   examination, she had decreased cervical range of motion with pain, decreased left shoulder range

9   of motion with pain and tenderness in the paravertebral muscles of the neck and back.  AR 412.

10  Her Roxicodone and OxyContin were refilled.  AR 412.

11      Plaintiff saw PA Johncox in March 2007.  AR 411.  She rated her symptoms at 3 out of

12  10 and felt "pretty stable with her medications."  AR 411.  On examination, Plaintiff was tender

13  in the paravertebral muscles of the cervical, thoracic and lumbar region.  AR 411.

14      On March 16, 2007, Plaintiff underwent an evaluation at North Oakland Medical Clinic

15  by Bruce Thompson, M.D., a board certified family practice and occupational medicine

16  physician.  AR 377-383.  On physical examination, Plaintiff had some arthralgia and exhibited

17  behavior of fatigue, difficulty maintaining focus, general arthralgia and aches and pains about her

18  shoulders, neck, upper back, mid back, knees and hips.  AR 381.  She frequently changed

19  positions.  AR 381.  She had "some generalized, localized tenderness to palpation ... at wide-

20  spread symmetrical and asymmetrical points throughout her body, including the following:

21  Trapezium, parcervical, periscapular, deltoid, arm, brachial radialis, wrist, hips, anterior thigh,

22  knees, consistent with fibromyalgia pain."  AR 382.  She appeared depressed and stated she was

23  depressed.  AR 382.  Dr. Thompson diagnosed her with fibromyalgia, chronic fatigue syndrome,

24  major unipolar depression, rheumatoid arthritis and hepatitis C.  AR 382.  Dr. Thompson opined

25  that "[c]learly this woman is unable to sustain any gainful employment, both because of her

26  fibromyalgia, as well as her depression and the effect of medication and chronic fatigue that is

27  contributed to by sleep disturbance, as well as hepatitis C."  AR 382.  Dr. Thompson further

28  opined that her prognosis was poor.  AR 382.

1     Dr. Thompson also completed a Multiple Impairment Questionnaire form.  AR 384-91.

2  Dr. Thompson estimated Plaintiff's level of pain as 7-8 and her level of fatigue as 8-9.  AR 386.

3  He opined that Plaintiff could sit for 3 hours and stand/walk for 2 hours in an eight-hour day.

4  AR 386.  She must get up and move around every thirty minutes for thirty minutes.  AR 387.

5  She could not stand/walk continuously in a work setting.  AR 387.  Dr. Thompson further opined

6  that Plaintiff could lift 0-5 pounds and 5-10 pounds occasionally, but could never lift more than

7  10 pounds.  AR 387.  She also could carry 0-5 pounds and 5-10 pounds occasionally, but could

8  never carry more than 10 pounds.  AR 387.  She had significant limitations with repetitive

9  reaching, handling, fingering or lifting because activity aggravated her pain.  AR 387.  She had

10  moderate limitations in grasping, turning and twisting objects and using her fingers/hands for

11  fine manipulations.  AR 387-88.  She had marked limitations using her arms for reaching.  AR

12  388.  Dr. Thompson indicated that he had substituted medication in an attempt to produce less

13  symptomatology or relieve side effects.  AR 388.  He further opined that Plaintiff's symptoms

14  likely would increase if she were placed in a competitive work environment.  AR 388.  Her pain,

15  fatigue or other symptoms were severe enough to interfere frequently with attention and

16  concentration.  AR 389.  Emotional factors due to depression contributed to the severity of

17  Plaintiff's symptoms and functional limitations.  AR 389.  Dr. Thompson also opined that

18  Plaintiff was incapable of even "low stress" work.  AR 389.  She would need to take unscheduled

19  breaks every thirty minutes for thirty minutes.  AR 389.  Her impairments were likely to produce

20  all bad days.  AR 390.  She likely would be absent from work more than three times a month.

21  AR 390.  Dr. Thompson further reported that Plaintiff's psychological limitations would affect

22  her ability to work at a regular job on a sustained basis.  AR 390.  She also could not push, pull,

23  kneel, bend or stoop.  AR 390.

24     In April 2007, Plaintiff complained to PA Johncox of right shoulder pain and hip pain

25  radiating down to her foot.  AR 410-11.  She rated her symptoms at 6 out 10.  AR 410.  Her

26  cervical spine range motion was decreased 30 percent with pain and she was tender in the

27  midthoracic spine.  AR 410.

28

Plaintiff again saw PA Johncox in May 2007.  AR 408-09.  She rated her pain at 6 out of 10 and reported that Zanaflex did not help her back spasms.  AR 408.  She asked for a new muscle relaxant.  AR 408.  On examination, Plaintiff exhibited a 50 percent decrease in cervical range of motion with complaints of neck pain.  AR 408.  She also had tenderness in the paravertebral muscles of the cervical spine, including from T4 to T8 and across the lumbar spine. AR 408.  She was provided a sample of Skelaxin to replace her Zanaflex.  AR 408.

On June 21, 2007, Plaintiff saw PA Johncox.  AR 406-07.  She rated her pain at 6 out of 10.  AR 406.  She also complained about pain in her right heel and ankle up to her hip and back. AR 406.  She reported awakening at night with panic and discussed her impending divorce.  AR 406.  On examination, Plaintiff ambulated slightly favoring the right lower extremity.  AR 406. Her cervical spine range of motion was decreased 50 percent on rotation of lateral flexion with complaints of neck pain.  AR 406.  She also was tender in the right plantar fascial region.  AR 406.  PA Johncox assessed Plaintiff with fibromyalgia, shoulder pain, and plantar fascitis.  AR 406.  She rejected an offer for referral to a podiatrist.  AR 406.  Plaintiff also stated that she was going to see her mother on the Oregon boarder and wanted an early refill on her medications of two days.  AR 406.

On July 12, 2007, Plaintiff saw Dr. Kalamkarian for follow-up treatment.  AR 405. Plaintiff reported having a viral infection and, due to excessive vomiting, she was unable to keep her medications down.  AR 405.  Dr. Kalamkarian indicated that "naturally, she has run short of her medication and is requesting an earlier refill."  AR 405.  He opined that "[u]nfortunately, this kind of episodes [sic] happens to this patient frequently," but noted it was a legitimate reason for giving her the medications two days early.  AR 405.  Her medications were renewed.  AR 405.

On August 8, 2007, Plaintiff sought treatment from PA Johncox and Dr. Kalamkarian. AR 403-04.  Plaintiff rated her pain a 6 out of 10.  AR 403.  Plaintiff complained of increased right hip pain.  AR 403.  On physical examination, she was tender in the right greater trochanter of the hip and tender over the ankles.  AR 403.  She was assessed with fibromyalgia and right hip pain.  AR 403.  Various treatment options were discussed with Plaintiff, including x-rays of the

1    right hip, aqua therapy and a block to the greater trochanter.  AR 403.  Plaintiff wanted to wait

2    for "various reasons."  AR 403.

3           On September 6, 2007, Plaintiff saw PA Johncox for follow-up treatment.  AR 401.  She

4    rated her pain as 4 out of 10 and complained that it hurt to lie on her hips, her sides or on her

5    back.  AR 401.  On examination, Plaintiff could heel walk, toe walk and ambulate within normal

6    limits.  AR 401.  She was tender in the paravertebral muscles of the lumbar spine and in the

7    greater trochanters.  AR 401.  She was assessed with fibromyalgia, along with left and right

8    greater trochanteric bursitis.  AR 401.

9           ALJ's Findings

10          The ALJ determined that Plaintiff met the insured status requirements of the Social

11   Security Act through December 31, 2005.  AR 19.  She had not engaged in substantial gainful

12   activity since her alleged onset date.  AR 19.  She had the severe impairment of fibromyalgia.

13   AR 19.  Despite this impairment, the ALJ found that Plaintiff retained the residual functional

14   capacity to perform the full range of sedentary work.  AR 20.  She could lift and carry ten pounds

15   occasionally and frequently, could stand and walk for a total of two hours and sit for a total of six

16   hours in an eight-hour workday.  AR 20.  Given this RFC, the ALJ concluded that Plaintiff could

17   perform her past relevant as a telemarketer.  AR 24.

18                              **SCOPE OF REVIEW**

19          Congress has provided a limited scope of judicial review of the Commissioner's decision

20   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

21   the Court must determine whether the decision of the Commissioner is supported by substantial

22   evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

23   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

24   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

25   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

26   401.  The record as a whole must be considered, weighing both the evidence that supports and

27   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

28   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

1  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

2  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

3  Commissioner applied the proper legal standards, and if the Commissioner's findings are

4  supported by substantial evidence.  *See* *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d

5  509, 510 (9th Cir. 1987).

6                                    **REVIEW**

7          In order to qualify for benefits, a claimant must establish that she is unable to engage in

8  substantial gainful activity due to a medically determinable physical or mental impairment which

9  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

10  U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of

11  such severity that she is not only unable to do her previous work, but cannot, considering her age,

12  education, and work experience, engage in any other kind of substantial gainful work which

13  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

14  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

15  Cir. 1990).

16          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

17  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

18  C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g).  Applying the process in this case, the ALJ found

19  that Plaintiff: (1) has not engaged in substantial gainful activity since the alleged onset of her

20  disability; (2) has an impairment or a combination of impairments that is considered "severe"

21  (fibromyalgia) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520, 416.920);

22  (3) does not have an impairment or combination of impairments which meets or equals one of the

23  impairments set forth in Appendix 1, Subpart P, 20 C.F.R. Part 404; and (4) can perform her past

24  relevant work as a telemarketer.  AR 19-24.

25          In this case, Plaintiff argues that the ALJ erred by rejecting the opinions of Drs. Padilla

26  and Thompson.

27                                    **DISCUSSION**

28  A.       Legal Standard

1          1.      Treating Physician - Dr. Padilla

2          Plaintiff first contends that the ALJ erred by rejecting the residual physical function

3 assessment of her treating physician, Dr. Padilla.  The opinions of treating doctors should be

4 given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*,

5 *157 F.3d 715, 725 (9th Cir. 1998)*; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Where the

6 treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear

7 and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.

8 Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject

9 this opinion without providing "specific and legitimate reasons" supported by substantial

10 evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).  This

11 can be done by setting out a detailed and thorough summary of the facts and conflicting clinical

12 evidence, stating his interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d

13 747, 751 (9th Cir. 1989).  The ALJ must do more than offer his conclusions.  He must set forth

14 his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey v.*

15 *Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

16          In arguing that the ALJ erred, Plaintiff appears to refer to the weight afforded by the ALJ

17 to the Medical Source Statement completed by Dr. Padilla in December 2005.  Opening Brief, p.

18 10; AR 22.  The ALJ gave "some weight" to this statement because it limited Plaintiff "to almost

19 the full range of sedentary work."  AR 22.  Consistent with Dr. Padilla's opinion, the ALJ

20 concluded that Plaintiff could lift and carry ten pounds occasionally and could stand and walk for

21 a total of two hours.  AR 20.  While Dr. Padilla opined that Plaintiff could carry less than 10

22 pounds frequently, the ALJ found she could carry 10 pounds frequently.  AR 20, 393.  Where Dr.

23 Padilla limited Plaintiff to sitting for less than six hours, the ALJ found her capable of sitting for

24 a total of six hours.  AR 20, 393.  Unlike Dr. Padilla, the ALJ did not determine that Plaintiff had

25 any postural limitations.  AR 20.

26          Plaintiff first faults the ALJ for discounting Dr. Padilla's opinion regarding Plaintiff's

27 sitting limitations because of an "illegible comment."  Opening Brief, p. 10; AR 22.  Plaintiff

28 contends that the ALJ's finding that some of the notations in Dr. Padilla's report were illegible is

1   "not an excuse to dismiss it," but required further inquiry to the treating physician.  Opening

2   Brief, p. 10.  When the evidence is ambiguous or "the record is inadequate" to allow for proper

3   evaluation of the evidence, the ALJ has a duty to develop the record.  *Tonapetyan v. Halter*, 242

4   *F.3d 1144, 1150 (9th Cir.2001).*  Accordingly, if the ALJ rejected Dr. Padilla's opinion because it

5   was illegible, the ALJ had a duty to "conduct appropriate inquiry," by re-contacting the authoring

6   physician, for an explanation or clarification of the opinion.  See SSR 96-5p ("Because treating

7   source evidence (including opinion evidence) is important, if the evidence does not support a

8   treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot

9   ascertain the basis of the opinion from the case record, the adjudicator must make 'every

10  reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

11          Plaintiff next challenges the ALJ's decision to reject Dr. Padilla's opinion because her

12  assessments were based on "subjective opinion."  AR 22.  Plaintiff argues that rejecting the

13  subjective nature of a fibromyalgia determination for lack of an objective basis "runs contrary to

14  the prevailing diagnostic paradigm established by the regulatory body governing the field of

15  rheumatology."  Opening Brief, p. 11.  The Ninth Circuit has recognized that fibromyalgia's

16  cause is unknown, there is no cure and it is diagnosed "entirely on the basis of patients' reports of

17  pain and other symptoms."  *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004).

18  Additionally, the Ninth Circuit has acknowledged that fibromyalgia's symptoms are entirely

19  subjective and that there are no laboratory tests for its presence or severity.  *Rollins v. Massanari,*

20  *261 F.3d 853, 855 (9th Cir. 2001)* (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)).

21  The Commissioner contends that while the fibromyalgia impairment may be diagnosed only on

22  subjective claims, the functional limitations resulting from such an impairment must be based on

23  objective data.  However, courts have found it error for an ALJ to discount a treating physician's

24  opinion as to resulting limitations due to a lack of objective evidence for fibromyalgia.  *Benecke,*

25  *379 F.3d at 594* and n.3; *see also* *Cota v. Commissioner of Social Sec.*, 2009 WL 900315, *9

26  *(E.D.Cal. Mar. 31, 2009)* (finding that the absence of atrophy, loss of strength, or difficulty with

27  range of motion an insufficient basis for rejecting subjective complaints resulting from

28  fibromyalgia); *Guevara v. Astrue*, 2009 WL 650736, *6 (C.D.Cal. Mar. 11, 2009) (noting that

due to the nature of fibromyalgia, the absence of laboratory or clinical findings is not a legitimate basis for rejecting a treating physician opinion); *cf. Yunt v. Commissioner of Social Sec.*, 2008 WL 596226, *2 (E.D.Cal. Mar. 3, 2008)* (concluding it was reasonable for ALJ to require treating physician's assessment of claimant with fibromyalgia to be supported by objective findings, such as grip strength and range-of-motion test data).

Even accepting the Commissioner's argument, the ALJ's decision to reject portions of Dr. Padilla's opinion based on its "subjective" nature is not legitimate or wholly consistent.  As noted, the ALJ gave some weight to portions of Dr. Padilla's opinion.  AR 22.  However, Dr. Padilla's entire opinion regarding Plaintiff's functional limitations, including those limitations accepted by the ALJ (standing, walking, lifting, carrying), were noted to be based on "subjective" opinion.  AR 393.  The ALJ does not explain why he accepted certain portions of Dr. Padilla's subjective opinion, but elected to reject others because of their subjective nature.

Further, the Commissioner's efforts to contrast Dr. Padilla's assessment with the findings of consultative examiner, Dr. Steven Stoltz, are neither instructive nor persuasive.  While Dr. Stoltz provided a less restrictive functional capacity assessment than Dr. Padilla, his opinion is not consistent with the ALJ's residual functional capacity assessment.  For instance, the ALJ gave some weight to Dr. Stolz's opinion that Plaintiff would be limited to four hours of standing and walking in an eight-hour workday, but ultimately determined, consistent with Dr. Padilla's opinion, that Plaintiff could stand and walk only two hours.  AR 21.  Further, Dr. Stoltz concluded that Plaintiff could sit without restriction, whereas the ALJ concluded she could sit for six hours out of an eight-hour workday.  AR 20, 21.  The ALJ also rejected Dr. Stolz's determination that Plaintiff was able to lift and carry without restriction.  AR 21.

Finally, Plaintiff argues that the ALJ erred by rejecting Dr. Padilla's opinion because she issued an opinion on the ultimate issue of disability.  In his decision, the ALJ observed that the file contained a "nearly illegible note" signed by Dr. Padilla and dated April 14, 2006, in which Dr. Padilla stated she would support the claimant's disability status and was doubtful that Plaintiff could work even part-time.  AR 22.  The ALJ indicated that the comments were

1  "essentially taken out of context because of illegibility," but it appeared that Dr. Padilla made a

2  determination of disability that was "reserved to the Commissioner."  AR 22.

3       In opposition, the Commissioner correctly points out that a determination of a claimant's

4  ultimate disability is reserved to the Commissioner, and that a physician's opinion is not

5  determinative.  20 C.F.R. § 404.1527(e).  However, that Dr. Padilla opined in a 2006 letter that

6  Plaintiff was disabled is irrelevant to the deference that should be afforded to Dr. Padilla's

7  residual function assessment.  Further, in evaluating a treating physician's opinion, the Ninth

8  Circuit has commented that it does not distinguish "between a medical opinion as to a physical

9  condition and a medical opinion on the ultimate issue of disability."  *Rodriguez v. Bowen*, 876

10 *F.2d 759, 762 n. 7 (9th Cir. 1989)*.  Indeed, "opinions from any medical source on issues reserved

11 to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence

12 in the case record that may have a bearing on the determination or decision of disability,

13 including opinions from medical sources about issues reserved to the Commissioner."  SSR 96-

14 5p.  The fact that Dr. Padilla's April 2006 opinion concerned the ability to work, rather than the

15 nature of Plaintiff's physical limitations, does not relieve the ALJ of the burden of offering

16 specific and legitimate reasons for rejecting the opinion.

17       In this instance, the ALJ failed to give specific and legitimate reasons for rejecting the

18 restrictions identified in Dr. Padilla's medical opinion particularly in light of the deference

19 afforded a treating physician in the Ninth Circuit.  *See, e.g., Orn v. Astrue*, 495 F.3d 625, 631-33

20 *(9th Cir. 2007)* (treating physician's opinion must be given controlling weight if it is

21 well-supported and not inconsistent with other substantial evidence in the record; even if the

22 opinion is not entitled to "controlling weight," it is "still entitled to deference").

23

24       2.      Examining Physician Opinion - Dr. Thompson

25       Plaintiff next argues that the ALJ erred by rejecting the opinion of examining physician,

26 Dr. Bruce Thompson.  As is the case with the opinion of a treating physician, the Commissioner

27 must provide "clear and convincing" reasons for rejecting an uncontradicted opinion of an

28 examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  And like the opinion

1   of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

2   can only be rejected for specific and legitimate reasons that are supported by substantial evidence

3   in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

4       Plaintiff first contends that the ALJ improperly objected to Dr. Thompson's assessment

5   because it was based on her subjective complaints which were found less than fully credible. AR

6   22.  Unlike Dr. Padilla's subjective opinion, the ALJ rejected the examining physician's opinion

7   based on the credibility of Plaintiff's statements.  A physician's opinion based to a large extent on

8   claimant's own accounts of symptoms and limitations may be disregarded where those

9   complaints have been properly discounted. *Morgan v. Commissioner of Social Sec. Admin.*, 169

10  F.3d 595, 602 (9th Cir. 1999).  In this instance, Plaintiff does not challenge the ALJ's credibility

11  determination.  Plaintiff also does not dispute the ALJ's finding that Plaintiff began the exam

12  with Dr. Thompson "untruthfully regarding her work history and weight gain/loss." AR 22.

13  Plaintiff also does not dispute the ALJ's findings that she complained to Dr. Thompson "of pain,

14  fatigue, focus problems, crying spells, mood changes, and loss of energy and motivation [and yet]

15  she claimed to be able to take care of her house, prepare meals, make the bed, and perform her

16  activities of daily living." AR 22.  It is proper to consider, as the ALJ did here, inconsistencies in

17  testimony or between testimony and conduct and daily activities in assessing the credibility of a

18  claimant. *Fair v. Bowen*, 885 F.2d 597, 603-604 and n.5 (9th Cir. 1989); *see also Thomas v.*

19  *Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

20      Insofar as Plaintiff argues that Dr. Thompson's assessment was based, not on Plaintiff's

21  subjective statements, but on his own findings and understanding of the nature of fibromyalgia,

22  Plaintiff's argument is not supported by the record.  Dr. Thompson's findings on examination

23  were limited.  Plaintiff only had general arthralgia, aches and pains and "some generalized,

24  localized tenderness to palpation ... consistent with fibromyalgia pain," but she exhibited normal

25  coordination and tandem gait with a negative Romberg sign and had full and equilateral motor

26  and sensory function and normal and equilateral deep tendon reflexes. AR 382.  Further, the

27  record does not indicate that Dr. Thompson had a specialized understanding or knowledge of

28  fibromyalgia.  Rheumatology is the "relevant specialty for fibromyalgia." *Benecke*, 379 F.3d at

594 n.4.  The record reflects that Dr. Thompson was a board certified family practice and occupational medicine physician, not a rheumatologist.  AR 383.

Next, Plaintiff challenges the ALJ's determination that Dr. Thompson's diagnosis of rheumatoid arthritis is contrary to the diagnosis of a specialist in rheumatology.  Plaintiff argues that the contradiction "is of no moment" because Dr. Thompson did not tie Plaintiff's functional limitations to rheumatoid arthritis.  Opening Brief, p. 13.  However, that the examining doctor's conclusions were contradicted by a specialist in the relevant area provides a specific, legitimate reason for discounting Dr. Thompson's opinion and affording it less weight.  *See, e.g., Benecke,* 379 F.3d at 594 n.4 (rheumatologist's opinion given greater weight because it is an opinion of a specialist); *Andrews,* 53 F.3d at 1043 (ALJ properly rejected favorable report from examining physician in favor of contrary reports from nonexamining specialist).  The ALJ also could infer that Dr. Thompson's opinion was less reliable because it was contrary to the specialist's opinion.  *Macri v. Chater,* 93 F.3d 540, 544 (9th Cir. 1996) (ALJ entitled to draw inferences logically flowing from the evidence).

As a final matter, Plaintiff contends that the ALJ erred by rejecting Dr. Thompson's assessment based on the fact that he examined Plaintiff on only one occasion, without a "longitudinal history."  AR 23.  Plaintiff correctly notes that the opinion of an examining doctor, if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *Andrews,* 53 F.3d at 1043.  However, if an examining physician is not familiar with the claimant's longitudinal history of medical impairments, his opinions will generally be given less weight than those of a treating source.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Indeed, the weight afforded a medical opinion depends on multiple factors, including the length of treatment and frequency of examination, nature and extent of treatment relationship, evidence to support the opinion, consistency of the opinion with the record as a whole and whether the opinion falls within a medical source's field of specialty.  *Id.*  Therefore, the ALJ was entitled to consider the length of the treatment relationship in assigning weight to Dr. Thompson's opinion.

B.     Remand

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

The Court finds that additional proceedings can remedy the ALJ's error and therefore REMANDS the action for further proceedings. On remand, the ALJ must explain his treatment of Dr. Padilla's opinion and, where the record is unclear, gather additional information.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for further proceedings consistent with this opinion. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Jean M. Belmont and against Defendant Michael J. Astrue, Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:    August 20, 2009          _____ /s/ Dennis L. Beck_____**
                                              UNITED STATES MAGISTRATE JUDGE